IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| PATRICK HATELY, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 1:17-cv-00502-AJT-JFA |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID WATTS, | ) | |
| | ) | |
| *Defendant*. | ) | |

**OPPOSITION TO DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERT WITNESS AND EXCLUDE EXPERT WITNESS TESTIMONY**

COMES NOW, Plaintiff PATRICK WADE HATELY (Plaintiff), by and through undersigned counsel, and respectfully submits this memorandum in opposition to the Motion to Strike Plaintiff's Expert Witness Report and Exclude Plaintiff's Expert Witness's Testimony, submitted by Defendant DAVID WATTS (Defendant). In support thereof, Plaintiff states as follows:

**ARGUMENT**

It is a staple of the federal courts that "'The rejection of expert testimony is the exception rather than the rule.'" *Joseph v. Carnes*, 2015 U.S. Dist. LEXIS 57135, at *3 (N.D. Ill. April 30, 2015) (quoting *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 128 F. Supp. 2d 1148, 1150 (N.D. Ill. 2001)).

"The proponent [of expert witness testimony] has a 'burden of *production* - - that is, the burden of coming forward with evidence from which the trial court could determine' that the evidence is admissible under *Daubert*." *Main St. Am. Group v. Sears, Roebuck, & Co.*, 2010 U.S. Dist. LEXIS 22667, at *8 (D. Md. March 11, 2010) (emphasis in original) (alteration added) (quoting *Maryland Cas. Co. v. Therm-O-Disc, Inc.*, 137 F.3d 780, 783 (4th Cir. 1998)). "Under

Rule 26(a)(2)(A), the disclosure of an expert witness 'must be accompanied by a written report - - prepared and signed by the witness' that includes, among other things, 'a complete statement of all opinions the witness will express and the basis and reason for them.'" *Id.* at *5 (emphasis removed) (quoting Fed. R. Civ. P. 26(a)(2)(A)).

Plaintiff properly disclosed his expert witness and the substance of the expert witness's testimony though the provision of the expert's report to Defendant. ECF # 61, *Defendant's Motion to Strike and Exclude* (Jan. 4, 2018) at p.2 ("In disclosing Keenan Keeling [] as his only expert witness in this action, Plaintiff served an initial copy of Mr. Keeling's report on October 27, 2017 . . ."). Plaintiff's expert witness has specialized knowledge and expertise in the subjects upon which Plaintiff expects him to testify. *See, e.g.*, ECF # 61-1, *Defendant's Exhibit "A" – Expert Report of Keenan Keeling* (Jan. 4, 2018) at pp.10-11 (detailing expert witness's qualifications and education); Exhibit # 1, *Deposition Transcript of Expert Witness Keenan Keeling*, at 20:16-19 ("I've been the CEO twice, for the last year and in the beginning for two years. The entire time, 11 years, I've been the primary software developer.").

Plaintiff's expert witness should not be precluded from testifying nor should his expert report be stricken because: (1) the expert witness prepared the expert report with assistance from Plaintiff's counsel; (2) the expert report does not express legal analysis, opinions, or conclusions, and the expert witness does not intend to testify to such matters; (3) there is nothing improper about the expert report's use of Wikipedia articles for the translation of technical explanations into concise, common parlance; and (4) all of the expert witness's testimony is "expert testimony," as that term is understood by Fed. R. Evid. 702.

## I. The Expert Report of Plaintiff's Expert Witness was Prepared by Plaintiff's Expert Witness, with Assistance from Plaintiff's Counsel.

"Rule 26 of the Federal Rules of Civil Procedure requires expert witnesses to prepare their own Rule 26 Reports." *Harmon v. United States*, 2017 U.S. Dist. LEXIS 150055, at *21 (D. Md. Sept. 15, 2017. "[A] report can be 'prepared' by an expert witness even if counsel has aided the witness in preparing an expert's report." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 292 (E.D. Va. 2001) (alteration added) (discussing Fed. R. Civ. P. 26, Advisory Committee Notes)). In order to strike an expert report, the opposing party must "demonstrate that the expert 'lacked significant personal involvement in the preparation of his report.'" *Id.* at 293 n.15 (quoting *Manning v. Crockett*, 1991 U.S. Dist. LEXIS 7966, at *4 (N.D. Ill. May 18, 1999)).

The expert report of Plaintiff's expert witness, Keenan Keeling, was drafted after Mr. Keeling and Plaintiff's counsel spoke at length about the technical issues presented in this case, Mr. Keeling's knowledge of the technical issues, and Mr. Keeling's opinions on the technical issues as they relate to the facts of this case.[1] While it was Plaintiff's counsel who then put pen to paper and summarized this conversation, it was Mr. Keeling who determined the overall content

[1] Exhibit # 1, 34:8-24 (Q The report, which is Deposition Exhibit Number 2, sir, who wrote that report? A It was written jointly by myself and Mr. Menhart. Q Do you know which parts you wrote and which parts Mr. Menhart wrote? A I do.).

and direction of his expert report.[2] Further, Mr. Keeling then spent at least five hours continuing to edit his expert report[3] and continued to communicate with Plaintiff's counsel about the same.[4]

In *Trigon*, *supra*, the United States District Court for the District of Virginia undertook an extensive exploration of various opinions that sought to determine the degree to which an expert witness must participate in the preparation of her own expert report in order to have satisfied the requirement that the report be "prepared" by the expert, per the language of Fed. R. Civ. P. 26(a)(2). Ultimately, the district court allowed the inclusion of the expert witness's testimony at trial. In *Harmon*, *supra*, the district court summarized the holding in *Trigon* thusly: "for the expert report to satisfy Rule 26 it (1) should be written in a manner that reflects the testimony to be given by the expert witness; and (2) must be signed by the expert." 2017 U.S. Dist. LEXIS 150055, at *21 (explaining 204 F.R.D. at 292).

---

[2] *Id.* at 40:18-41:5 (Q Do you see that paragraph? Did you write that paragraph or did Mr. Menhart write that paragraph? A We actually wrote that jointly. Q And how did you come to write it jointly? A Mr. Menhart started. I went in and cleaned it up. Q Okay. So, he drafted it, and you then revised it and made changes? A Yes.).

[3] *Id.* at 16:6-15 (Q How long did it take you to prepare your report, sir? A Several hours. Q Was it more or less than five hours? A More. Q Was it more or less than ten? A I'd have to check my timesheet. Q Okay. You have a timesheet that relates to this? A Yes.).

[4] *Id.* at 12:20-13:22 (Q Okay. Aside from this morning, when is the most recent meeting or conversation you had with Mr. Menhart about your deposition? A Last night. Q Did you speak to him or did you meet with him? A I spoke with him. Q By telephone? A Yes. Q For how long? A Five-ish minutes. Q Did you have any other conversations with Mr. Menhart in preparation for your deposition today? A Yes. Q Aside from the telephone call last night and the meeting this morning, when was the most recent time that you spoke or met with Mr. Menhart regarding your deposition today? A I think it was Thursday. Yes, Thursday. Q Okay. Did you meet with him or did you speak with him? A Speak over the phone. Q For how long? A 45 minutes.).

Here, Mr. Keeling has (1) confirmed that the expert report contains the full testimony that he expects to be called upon to provide at trial[5] and (2) signed the expert report. *See* ECF # 61-1, p.9 (page of expert report exhibiting Mr. Keeling's signature).

Examining a case originating in a Kansas federal district court, the *Trigon* court expressed the opinion that a significant "distinction [exists] between those opinions that an expert 'freely authorize[s] and adopt[s] as his own' and those that are done 'merely for appeasement or because of intimidation or some undue influence by the party or counsel who has retained him.'" 204 F.R.D. at 292 (alterations added) (quoting *Marek v. Moore*, 171 F.R.D. 298, 302 (D. Kan. 1997)). Here, there is no allegation that Plaintiff or his counsel attempted to exert any form of undue influence over Mr. Keeling. Similarly, not only did Mr. Keeling "freely authorize and adopt" the expert report as his own,[6] the initial drafting of the expert report was undertaken at Mr. Keeling's direction. *See supra*.

Examining a decision out of the Northern District of Illinois, the *Trigon* court cited with approval the district court's decision *not* to strike the expert report at issue, contrasting the facts with a situation in which striking an expert report would be proper: "The court further reasoned

---

[5] *Id.* at 15:11-16:5 (Q All right. Does this report, which is Deposition Exhibit Number 2, contain a complete statement of all of the opinions that you will express in this matter? A Yes. Q And does it also contain the basis and the reasons for each of those opinions? A Yes. Q All right. And, in fact, it sets forth the specific sources of all of the information that formed the basis of your opinions; is that correct? A Yes. Q Does it include all of the exhibits that you might use at trial or another hearing to summarize or support your opinions in this matter? A As best as I can say today, yes.), 39:20-40:11 (Q So, among other things, in the assignment section, you were asked to be prepared to testify generally as to the technical aspects of the Internet, web-based email accounts, IP addresses and mail servers; is that correct? A Yes. Q And then the section at the bottom of page 3, going onto page 4 and beyond, "The Internet" - - entitled "The Internet, Email, and IP Addresses," this section sets forth a complete statement of all of the opinions you will express on that particular subject and also the basis and the reasons for those opinions; is that correct? A Yes.).

[6] *Id.* at 14:16-19 (Q All right. And, in fact, on page 9 of Deposition Exhibit Number 2 appears your signature; is that correct? A Yes.).

that, 'allowing an expert to sign a report drafted entirely by counsel ***without prior substantive input from an expert*** would read the word 'prepared' completely out of the rule.'" 204 F.R.D. at 293 (emphasis added) (quoting *Manning*, *supra*, at *2-3). Here, it is understood that Mr. Keeling was involved in every stage of the creation of the expert report. *See supra*. Pointing out that Mr. Keeling was not the individual who initially typed the words of the report into a computer does not lessen his involvement.

In his Brief, Defendant cites to *In re Jackson Nat. Life Ins. Co. Premium Litig.*, 2000 U.S. Dist. LEXIS 1318 (W.D. Mich. Feb. 8, 2000), and summarizes its meaning thusly: "[The court] conclud[ed] that counsel exceeded the bounds of legitimate assistance in preparing [the] expert report and preclud[ed] the proffered expert testimony as a result." ECF # 61, pp. 3-4 (alterations added). However, the facts in *Jackson* are clearly distinguishable; there, the *true* nail in the coffin for the expert report at issue was the fact that the expert ***lied*** about the report's authorship, attempting to mislead and deceive the opposing party about the extent of his participation in its preparation. *Id.* at *1 (affirming the magistrate's finding "that [the expert] testified untruthfully in his deposition concerning the authorship of the language of the report and that plaintiffs' counsel unjustifiably impeded defendant's counsel's search for the truth of the matter"). That is a far cry from the forthright and detailed manner in which Mr. Keeling explained the writing process of the expert report to Defendant's counsel.[7] *See also supra*.

[7] *See*, *e.g.*, *id.* at 43:4-14 (Q Okay. So, taking a look at the second paragraph on page 4 of the Deposition Exhibit Number 2, which is your report, it begins with, "Electronic mail (email or e-mail." Do you see that paragraph? A Yes. Q Who wrote that paragraph? A Mr. Menhart. Q All right. Did you make any changes to that paragraph before - - A I'm checking. Maybe a word or two.), 46:19-47:16 (Q Okay. Do you remember which word or two you changed in this paragraph? A I am fairly certain I wrote the part about the client. Q Which part is that, sir? A Which is the last sentence. Q You wrote the last sentence. Okay. A I did not say that. Q You did not? A I just want to be clear. I didn't say I wrote that last sentence, but I do remember - - I do remember adding the part about the client. So, I cannot remember if I wrote - - and forgive me. This was months ago - -

In *Harmon*, the defendant objected to the inclusion of the testimony of two of the plaintiff's expert witnesses at trial. 2017 U.S. Dist. LEXIS 150055, at *20-26. The court noted that the experts' "reports [were] almost identical." *Id.* at *24 (alteration added). But, the court went on: "However, the experts also confirmed that they signed the reports only after concluding that they reflect the opinions each doctor holds. Both experts also explained that even though they were invited to edit the reports, no edits were necessary as the reports accurately reflected their conclusions . . ." *Id.* at *25 (internal citations omitted). The court concluded that the fact that the experts did not "draft" their own reports was not relevant to the reports' admissibility. *Id.*

Here, Mr. Keeling directed the creation of his expert report from its inception. He edited the report at length. *See supra.* Although most of Mr. Keeling's edits did not dramatically alter the content of the report, *see* ECF # 61, p.5; *see also supra*, that is necessarily so, given his input prior to its first drafting. And, ultimately, he signed said report and attested to it as his own sworn opinion. *See supra.* Further, Mr. Keeling has been entirely forthcoming about the preparation

that I wanted to be clear that the word "client" was important. Q All right. So, you don't know if you wrote that last sentence, but you did want to ensure that the word "client" was included in that last sentence. A As I remember it, yes.), 52:19-53:12 (Q All right. Third paragraph on page 4 of your report, who wrote that paragraph, sir? A This paragraph was also jointly written. Q All right. So, when you say paragraphs, does that mean that Mr. Menhart wrote it and then you revised it or reviewed it? A Not in all cases. Q In this paragraph, who did the first draft of this paragraph? A This paragraph - - yes, Mr. Menhart drafted this paragraph. Q So, is it true that Mr. Menhart actually drafted the first draft of your expert witness report? A No.), 55:11-56:10 (Q I asked about the third paragraph, and you said you added the "client" to the - - A Right. So there's - - there's a statement in here about preparing web browser access to email client access. Q Okay. A I can't remember if I wrote the part about the compatible web browser. I think I wrote that. The web-based email platform, user preference part. Q Where is that? A That's just further down in the paragraph. It starts with, you know, it's not typically downloaded to the client. Q Okay. So, from "mail is typically not downloaded to the client so it can't be read without a current Internet connection," your addition started there and where did it end in that paragraph? A I would not say that unequivocally. I mean there was a paragraph there; I made a bunch of changes; and now there's a new paragraph.).

process. It has been detailed in the record, and it shows the propriety of his conduct. There is no reason to conclude that Mr. Keeling did not "sufficiently" participate in the preparation of his expert report, nor is there any basis for precluding Plaintiff from introducing the report and Mr. Keeling's testimony at trial.

## II. THE EXPERT REPORT DOES NOT EXPRESS LEGAL ANALYSIS, OPINIONS, OR CONCLUSIONS & THE EXPERT WITNESS DOES NOT INTEND TO TESTIFY TO SUCH MATTERS.

The expert report of Plaintiff's expert witness, Keenan Keeling, does not contain any legal analysis, opinions, or conclusions. Mr. Keeling does not claim any legal expertise, nor does he attempt to take the court's place by "improperly 'invad[ing] the judge's province of instructing the jury' on the controlling law." *The Harvester, Inc. v. Rule Joy Trammel + Rubio, LLC*, 2010 U.S. Dist. LEXIS 66519, at *16 (E.D. Va. July 2, 2010) (alteration added) (quoting *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002)). Rather, Mr. Keeling was presented with technical analyses in his field of expertise that had been promulgated by a number of courts and was asked to evaluate their technical conclusions and the reasoning behind them.[8] Mr. Keeling did exactly that, and the expert report comprises his opinion on those technical conclusions.[9]

---

[8] *Id.* at 59:7-17 (Q Well, yes, of course. So, on page 5, it goes on to say, "However, Plaintiff's attorneys provided me with certain pieces of information found in opinions discussing the Stored Communications Act, which I understand to be the law upon which this case is based." Do you see that sentence? A Yes. Q All right. So, Mr. Menhart provided you with pieces of certain cases? A Yes.), at 70:16-20 (Q And, in fact, you didn't actually read any of these opinions either, did you? A I read the portions that I was provided and a little bit more of the Theofel and Bailey - - well, mainly the Theofel one.).

[9] *Id.* at 57:10-17 (Q Now, with respect to your being asked to explain the manner by which mail servers maintain backup copies of communications, those two sections contain a complete statement of all of your opinions that you'll express on the subject and the basis and reasons for those opinions; correct? A Yes.).

Defendant relies heavily upon *Carnes*, *supra*, 2015 U.S. Dist. LEXIS 57135, for his argument that an expert witness's legal testimony should be excluded. In *Carnes*, the testimony sought to be excluded was from an expert in the law. Although the plaintiff proffered the expert's testimony on many subjects of which the court disapproved, only one topic is factually similar enough to the facts of *this* case to be illustrative here: testimony on "the manner in which the stored emails at issue fit within a reasonable interpretation of the SCA . . .". *Id.* at *3.

However, unlike the expert in *Carnes*, Mr. Keeling does not intend to testify as to any part or portion of the Stored Communications Act,[10] nor any other statute or their meanings. Mr. Keeling does not intend to "proffer[] testimony about legal research into the SCA," ECF # 61, p.7, nor does his report "engage[] in impermissible statutory interpretation," *id.* at p.9, and he does not "seek[] to testify about the manner in which the emails at issue fit within what he believes to be a reasonable interpretation of the SCA," *id.* at p.10.

Rather, Mr. Keeling will proffer testimony in his field of expertise, providing the jury with invaluable information about the technical workings behind such technologies as e-mail, computer servers, and the Internet. *See supra.* With Mr. Keeling's testimony in hand, the members of the jury will be able to better evaluate whether or not the facts of this case fit into the legal definitions they will receive from this Court.

Whether or not legal testimony must be excluded from the jury's consideration is immaterial here; Mr. Keeling does not intend to offer legal testimony, and Defendant's mischaracterization of Mr. Keeling's report and deposition testimony provides no basis upon which to strike his testimony before the jury.

[10] *Id.* at 74:9-11 (Q Okay. Have you ever read the Stored Communications Act? A No, I have not.).

## III. THE EXPERT REPORT'S USE OF WIKIPEDIA'S CONCISE TECHNICAL DEFINITIONS, WRITTEN IN COMMON PARLANCE, IS NOT IMPROPER.

Defendant takes issue with Mr. Keeling's use of Wikipedia in his expert report, excerpts of which were included as elegant translations of complex, technical topics into language that the average individual might be capable of understanding. *See generally*, ECF # 61, pp.11-13.

Defendant cites to *United States v. Lawson*, 677 F.3d 629 (4th Cir. 2012), to support his argument that – particularly in *this* Circuit – the mere mention of Wikipedia is anathema to the judiciary. ECF # 61, pp.11-12. In *Lawson*, the Court of Appeals considered whether to vacate the defendants' convictions in an animal-fighting prosecution due to the misconduct committed by a juror in the proceedings below. 677 F.3d at 639. There, the judge had forbidden the jury from performing their own independent research on the case. *Id.* In direct contravention of this instruction, however, a juror used Wikipedia to look up a term found in the relevant statute, and said juror then went on to share the information he found with other members of the jury. *Id.*

The single paragraph discussing the reliability of Wikipedia – out of the Court of Appeals for the Fourth Circuit's 35-plus-page opinion – was only in reference to its use by legal actors and lay persons who – lacking in knowledge on a topic – then rely solely upon Wikipedia for explanations of technical and scientific terms of art. *Id.* at 650-51.

When the district court below had discovered the juror's misconduct, it acknowledged that the Wikipedia page the juror had accessed contained largely the same definition that the court would have provided to the jury, had a definition been requested. *Id.* at 648. The appellate court's "great[] concern[] about the use of Wikipedia in this context," however, was not premised upon its reliability or lack thereof. Unconcerned with Wikipedia's reliability, the Court noted two facts it found truly disconcerting: (1) no one was capable of ascertaining ***precisely*** what information the Wikipedia page contained ***on the day that it had actually been accessed by the juror***; and (2)

based upon the Wikipedia page available at the time of the Court's writing, it was "near[ly] certain[] that the Wikipedia entry that [the juror] researched contained significantly more information than any traditional legal definition of the term [at issue]" and "read[] more like a narrative than a definition." *Id.* (alterations and emphases added).

Despite Defendant's contentions *here*, there is no general ban against the use of Wikipedia in legal proceedings or documents. *See, e.g.*, *Capital Concepts, Inc. v. Mt. Corp.*, 936 F. Supp. 2d 661, 672 n.13 (W.D. Va. 2013) (citing to Wikipedia for a definition of "ipse dixit"); *Tharpe v. Lawidjaja*, 8 F. Supp. 3d 743, 779 (W.D. Va. 2014) (citing to Wikipedia while defining a "model release"); *Downing v. United States*, 2008 U.S. Dist. LEXIS 25119, at *33 n.9 (W.D. Va. Mar. 26, 2008) (citing to Wikipedia for the proper medical term for "testicular pain"); *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (deeming definition found on Wikipedia "far more relevant" than the definitions of the same term found in the 1963 and 2002 editions of *Webster's Third New International Dictionary*); *Pan Am Sys. v. Atl. Northeast Rails & Ports, Inc.*, 804 F.3d 59, 70 n.7 (1st Cir. 2015) (citing to Wikipedia for definition of "interchange – in railway lingo"); *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 140 n.9 (1st Cir. 2006) (citing to Wikipedia for image of Marchel Duchamp's famous art piece, "Bicycle Wheel"); *United States v. Brown*, 669 F.3d 10, 18 n.12 (1st Cir. 2012) (citing to Wikipedia for explanation of "the so-called sovereign citizen movement"); *Reuland v. Hynes*, 460 F.3d 409, 421 n.1 (2d Cir. 2006) (Winter, J., dissenting) (citing to Wikipedia for statistics on land area of Compton, Washington, D.C., Baltimore, Detroit, and Chicago); *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 96 n.1 (2d Cir. 2010) (citing to Wikipedia for origin story and history of eBay and its name); *Zeiler v. Deitsch*, 500 F.3d 157, 162 n.5 (2d Cir. 2007) (citing to Wikipedia for definitions of "Torah law" and "Halachic law"); *Allegheny Def. Project, Inc. v. United States Forest Serv.*, 423 F.3d 215, 218 n.5

(3d Cir. 2005) (citing to Wikipedia for definition of "understory"); *Brown v. Nucor Corp.*, 576 F.3d 149, 156 n.9 (citing to Wikipedia for explanation of standard deviations in statistics); *Ordinola v. Hackman*, 478 F.3d 588, 593 n.4 (4th Cir. 2007) (citing to Wikipedia for explanation of lime's use "in the burial of bodies in open graves because the compound suppresses the odor of decomposing bodies"); *Cardoni v. Prosperity Bank*, 805 F.3d 573, 576 n.2 (5th Cir. 2015) (citing to Wikipedia for win-loss-tie statistics in Red River Rivalry between the University of Texas and the University of Oklahoma); *In re La. Crawfish Producers*, 852 F.3d 456, 459 n.1 (5th Cir. 2017) (citing to Wikipedia's pages on *Crayfish* and *List of U.S. State Crustaceans*); *Jabary v. McCullough*, 686 Fed. Appx. 282, 283 n.1 (5th Cir. 2017) (per curiam) (citing to Wikipedia for explanation of a "hookah lounge").

The cases listed above are merely a sampling of courts that have turned to Wikipedia as a reliable resource for factual information and common-parlance explanations of words, phrases, and ideas that run the gamut from the "sovereign citizen movement" to the use of lime to mask the smell of decomposition around mass graves.

Defendant continues to cite to cases that he believes support his argument in favor of striking Mr. Keeling's testimony and his expert report because of the use of Wikipedia. Although the language of *Hamilton v. Menard, Inc.*, 2011 U.S. Dist. LEXIS 92883 (N.D. Ohio Aug. 19, 2011), that Defendant quotes appears damning on its face, the facts of the case are incredibly different from those here, as is the use of Wikipedia. In *Hamilton*, the court determined that Wikipedia "is inappropriate for someone . . . to rely upon [] ***in rendering a medical diagnosis***." *Id.* at *4 (alterations and emphasis added).

Here, the language from Wikipedia that is used in the expert report does not form the content of Mr. Keeling's opinion, but rather provides a succinct explanation of some of the relevant

technological knowledge that is available to him. Defendant points out that "[t]he Expert Report [] does not indicate whether the Wikipedia pages relied upon were subject to scholarly peer review and publication in relevant journals in the technical community," ECF # 61, p.13, and that it "is silent as to the known or potential rate of error of the Wikipedia pages relied upon," *id.* However, Defendant does not point out any errors in the language from Wikipedia that has been included in the report. *See, e.g.*, *United States v. Liew*, 2013 U.S. Dist. LEXIS 172893, at *8 (N.D. Cal. Dec. 9, 2013) ("Further, although Defendants point out that some of the Wikipedia pages at issue contain warnings, they have not pointed the Court to any actual factual errors on those pages.").

Moreover, while Defendant has attempted to paint Mr. Keeling's use of Wikipedia as outright plagiarism,[11] the use of Wikipedia was acknowledged in footnotes of the expert witness report itself, *see* ECF # 61-1, pp.4-5, and forthrightly discussed in Mr. Keeling's deposition.[12] The use of Wikipedia provides no basis for the exclusion of Mr. Keeling's testimony nor for the striking of his expert report.

## IV. The Testimony of Plaintiff's Expert Witness Regarding Plaintiff's Website Screenshots Is Based Upon the Expert Witness's Advanced and Specialized Knowledge & Skills

Mr. Keeling's testimony that Plaintiff's website screenshots are consistent with what he has personally experienced is relevant and admissible as expert testimony because Mr. Keeling's personal experience is what he has observed, experienced, and paid attention to over the course of

---

[11] *Id.* at 51:13-16 (emphasis added) (Q All right. Did you express any concern about not having quotes around the parts that were ***cribbed*** directly from Wikipedia? A No.). *Cf.* "Cribbed," as used by Defendant's counsel, is defined as: (a) "a translation, list of correct answers or other illicit aid used by students while reciting, taking exams, or the like; pony"; (b) "plagiarism"; and (c) "a petty theft." www.dictionary.com/browse/crib?s=t (last accessed Jan. 17, 2018).
[12] Exhibit # 1, 51:17-52:2 (Q Did you indicate any concerns about how it made you look in terms of your credibility as an expert to cut and paste directly from Wikipedia in your report? A No. Q Why not? A Because it's all true, and it's well-known.).

his extensive, advanced, and specialized education and career. All expert knowledge is necessarily *personal* knowledge, as an expert cannot testify to something that they do not personally know, whether that knowledge has been gained through real-life experiences or memorizing a textbook.

"'Certainly it is possible for the same witness to provide both lay and expert testimony in a single case.'" *United States v. Wilson*, 484 F.3d 267, 278 n.5 (4th Cir. 2007) (quoting Fed. R. Evid. 701 Advisory Committee Notes). *See also United States v. Palacios*, 677 F.3d 234, 241 (4th Cir. 2012) (noting that district court allowed law enforcement officer to testify both as an expert witness – "based on his training and experience investigating MS-13 as part of the Prince George's County Police Department Gang Unit" – "on the gang's development, organization, policies, practices, and symbols," and as a lay witness "about events he personally observed while investigating Maryland-area MS-13 cliques").

Mr. Keeling is an expert in e-mail systems, and has served as the administrator for such a system in the past.[13] His testimony that Plaintiff's screenshots are consistent with what he has personally seen, despite stemming from personal knowledge, carry an extra weight, given his experience and expertise. Mr. Keeling should be permitted to testify to these facts, and this portion of the expert report should not be stricken.

[13] *Id.* at 82:21-83:22 (Q Have you ever administered an email system? A Yes. Q And where was that? A At Automata Studios. Q Are your company's emails backed up? Are they - - is there a copy made for the purposes of backup protection? A Yes. Q And how is that done? Q It's handled by the email software. Q And it's - - it's Google that does that? A Well, now you've jumped a little bit around, and since that you've asked if I've ever administered an email server, and I answered yes, and you asked where, and I said at Automata Studios. Q But now it's done by Google, but it used to be - - I see the mistake. So, prior to using a Gmail-based system, your company had its own email system. A Yes. Q And you administered that system. A Yes.).

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court rule in his favor and deny Defendant's Motion to Strike Plaintiff's Expert Report and Exclude Plaintiff's Expert Witness's Testimony.

Respectfully submitted,

/s/ Eric Menhart*
Eric Menhart, Esq.
*Admitted Pro Hac Vice*
Lexero Law
316 F St. NE Suite 101
Washington, DC 20002
Phone: 855-453-9376
Fax: 855-453-9376
Eric.Menhart@Lexero.com

/s/ William P. Robinson
William P. Robinson III, Esq.
Tysons Pond 2 Center
1604 Spring Hill Road Suite 300
Vienna, VA. 22182
703-789-4800 phone
703-351-7579 fax
william@robinsonslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed via the Court's ECF system and all parties of record were served via that system.

/s/ William P. Robinson
William P. Robinson III, Esq.